UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

United States of America,

     v.

Francis Tessina,                   15-CR-130
                                   DECISION
          Defendant.
_____

On March 29, 2017, the defendant, Francis Tessina ("Tessina"), pled guilty to a two-count indictment charging him with possession of a mixture of heroin and fentanyl with the intent to distribute it in violation of 21 United States Code Section 841(a)(1). Docket Item 59; Docket Item 11.

Tessina's indictment and plea were based on the drugs involved in two controlled buys—on March 9 and March 10, 2015. Docket Item 1 at 3-4; Docket Item 94 at 24. But the maelstrom that led to the controlled buys and the story that follows is more complex. Although Tessina's indictment was silent on the matter, the death of James Forness was the event that led to Tessina's arrest and triggered the sentencing issues now before this Court.

## BACKGROUND

On February 28, 2015, James Forness, a resident of Hamburg, New York, was found dead in his parents' home from a suspected drug overdose. Docket Item 1 at 3. The cellphone that police recovered from the scene contained text messages linking John Haak to the drugs that caused Forness's overdose. *Id.*

On March 2, 2015, Hamburg Police Detective Glenn Zawierucha interviewed Haak to investigate Forness's death and the source of the drugs. *Id.* During the course of the interview, Haak made several statements that implicated himself; his friend, Mark Schukraft; and Tessina. Most important to Detective Zawierucha, Haak divulged that Tessina was the source of the drugs that Haak himself sold to Forness. *Id.* Because Zawierucha told Haak that he was "looking for his cooperation on this" and that cooperating would save Haak "a world of hurt," Haak agreed to be a liaison with the investigators and arrange controlled buys with Tessina.[1] Gov. Ex. 1 at 11:00; Docket Item 1 at 3.

The controlled buys occurred on March 9 and March 10, 2015. The drugs obtained from the buys were sent to a laboratory to determine their weight and content. Tessina was arrested following the second controlled buy on March 10, and this prosecution followed.

## PROCEDURAL HISTORY

Tessina pled guilty to both counts against him. Because Tessina pled to an open indictment, the government provided him and the Court with a "Calculation of the Maximum Sentence and Sentencing Guideline Range" pursuant to *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991). Docket Item 60. By the government's

---

[1] Zawierucha's promise proved disingenuous: Haak later was indicted on similar charges. Docket Item 1, 1:15-cr-00220. This Court found that Haak's statements could not be used against him, however, as they were taken in violation of his Fifth Amendment rights. Docket Item 44, 1:15-cr-00220. That decision is currently on appeal to the Second Circuit. Docket Item 50, 1:15-cr-00220. The interview central to that decision was resubmitted by the government as evidence in connection with the disputed sentencing factors in this case. Gov. Ex. 1, 1:15-cr-00130.

account, the statutory maximum sentence for Tessina's offense was twenty years imprisonment, a fine of $1,000,000, a mandatory $100 special assessment, and a minimum three-year term of supervised release.  Docket Item 60 at 1.  But the government also informed Tessina and the Court that it intended to argue for an upward departure under United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines") Section 5K2.1, the death policy statement, and Section 5K2.2, the physical injury policy statement, as well as for a non-Guidelines sentence above the range.  Docket Item 60 at 4.

The indictment to which Tessina pled guilty did not charge that a death resulted from his criminal conduct,[2] nor did it attribute a specific drug weight to his offense. Rather, both the government and the defense contemplated dealing with those issues at the time of sentencing.  Docket Item 94 at 22.  Although Tessina admitted that the drugs in the controlled buys contained both heroin and fentanyl, he explicitly contested (1) any knowledge that the drugs contained fentanyl, Docket Item 94 at 25-26; (2) the laboratory reports that included the weight of the drugs, Docket Item 93; and (3) the appropriateness of an upward departure based on the death policy statement, Docket Item 71.

Shortly after the plea colloquy, the Presentence Investigation Report ("PSR") calculated Tessina's base offense level as 16, based primarily on the drug weights to

---

[2] Had the government charged that a death resulted, it would have been required to prove that as an element of the offense—that is, beyond a reasonable doubt.  *See Burrage v. United States*, 134 S. Ct. 881, 887 (2014).  With that higher burden of proof would have come increased statutory penalties:  from a maximum term of imprisonment of twenty years and no mandatory minimum term to a maximum term of imprisonment of life and a mandatory minimum term of twenty years.  21 U.S.C. Section 841(b)(1)(C).

which Tessina now objects. Docket Item 63 at 7. In addition to the weight of the drugs obtained from the controlled buys, the PSR included an additional 24 grams of heroin—an estimated number based on statements made by Haak in the interview discussed above. *Id.* The PSR also alerted the Court to the possibility of an upward departure pursuant to the death policy statement. *Id* at 29.

After the PSR was issued, both sides submitted a series of sentencing-related motions and briefs. Docket Items 70; 71; 77; 78; 79; 92; 93; 104; 105; 106; 107; 108; 109. Although those papers are many and voluminous, the disputes center on two main issues: (1) the drug quantity attributable to Tessina that will determine his base offense level and (2) the request for an upward departure under Sentencing Guidelines Sections 5K2.1 or 5K2.2. To facilitate a decision on these motions, a number of sentencing-related hearings were held: evidentiary hearings on August 8 and August 18, 2017, Docket Items 91 and 97; and oral argument on October 31, 2017, Docket Item 111.

After addressing the Sentencing Guidelines generally, this decision will address each of the key issues in turn.

## DISCUSSION

## I. SENTENCING AND THE SENTENCING GUIDELINES

### A. Procedure

The now-advisory Sentencing Guidelines, *see United States v. Booker,* 543 U.S. 220 (2005), are the requisite starting point for a district court's determination of a sentence. *Rita v. United States,* 551 U.S. 338, 350 (2007). But district courts have "wide latitude" to fashion a sentence that appropriately fits both the convicted defendant

and the crime committed. *See United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). And even a court's calculation within the Guidelines range does not result in a presumptively reasonable sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Once a court resolves disputed issues of fact and accurately calculates the Guidelines range, it next considers whether any departure is warranted and weighs the factors in 18 United States Code Section 3553(a) to decide whether to vary from the Guidelines. *See id.* In so doing, judges should make an individualized assessment of the factors applicable to the defendant, and they have broad discretion to facilitate the process. Indeed, while judges must consider the Guidelines and the Section 3553(a) factors in deciding on a sentence, they "need not utter robotic incantations" of each factor that may or may not be relevant. *United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013) (internal quotations omitted). Based on that analysis, the sentence imposed by the court may well be outside the Guidelines range; but major differences from the Guidelines range should be supported by good reasons. *Gall*, 552 U.S. at 50.

Although sentencing decisions rest ultimately with the judge, both the defense and prosecution may advocate for a particular sentence, including a departure or variance from the Guidelines, unless a plea agreement provides otherwise. When each side asks for a different sentence, the sentencing judge has an additional onus to explain the sentence imposed. *Rita*, 551 U.S. at 357. Because appellate courts and the parties are not mind readers, a sentencing judge should explain the sentence, the facts relied on, the factors considered, and the reasons for imposing a Guidelines or non-Guidelines sentence. *Id.*

## B.    Evidentiary standards in sentencing

Even though a defendant is adjudged guilty by the time of sentencing, the defendant's due process rights are not checked at the courtroom door.  *See United States v. Pugliese*, 805 F.2d 1117, 1121 (2d Cir. 1986).  For that reason, the sentencing court must balance the defendant's procedural rights with the defendant's guilt and the need to impose a fair punishment.  *See id.*

A sentencing court has broad discretion in deciding what information to consider:  so long as the defendant is afforded an opportunity to respond and the information has some indicia of reliability to ensure that it is likely accurate, the information is fair game and the formal rules of evidence do not apply.  *United States v. Concepcion*, 983 F.2d 369, 387-88 (2d Cir. 1992); Sentencing Guidelines Section 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").  By the same token, "unreliable allegations shall not be considered" by the sentencing court.  Sentencing Guidelines Section 6A1.3, (commentary).  And if the reliability of certain information is challenged, corroborating evidence can help the court determine whether the information is, in fact, reliable.  *United States v. Romano*, 825 F.2d 725, 728-29 (2d Cir. 1987); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978).

Courts also employ a lower burden of proof to resolve disputed facts at sentencing (proof by a preponderance of the evidence) than a jury or the court does at trial (proof beyond a reasonable doubt).  *See United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007).  So to protect a defendant's constitutional rights at sentencing, it is

6

especially important that the court weigh the reliability and accuracy of any evidence or information and whether that information proves a sentencing factor.  *See Pugliese*, 805 F.2d at 1121; *United States v. Tucker*, 404 U.S. 443, 591-92 (1972).

If a drug crime has different statutory penalties depending on the weight of the drugs or whether death resulted from the drugs, as is the case here, the government has a choice to make.  It can charge a specific weight and a resulting death and prove those as elements of the crime beyond a reasonable doubt—in which case the defendant will be subject to a higher maximum sentence, and perhaps a mandatory minimum sentence, of incarceration.  *See United States v. Thomas*, 274 F.3d 655, 673 (2d Cir. 2001); *see also Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Or the government can leave the determination of weight and whether death resulted to sentencing—in which case the government loses the mandatory minimum and increased maximum penalty but gains the benefit of proof of those factors by a preponderance of evidence.  *See Thomas*, 274 F.3d at 673.

Here, the government chose the latter approach.  As a result, this Court must decide:  (1) the weight of the drugs attributable to Tessina and (2) whether the drugs that Tessina sold resulted in the death of James Forness.  Because the drug weight dictates the base offense level under the Guidelines, the Court begins its analysis there.  After deciding the appropriate base offense level, the Court will address whether the government has proved by a preponderance of evidence that a death resulted from Tessina's criminal conduct, which would justify an upward departure.

## II.  DRUG WEIGHT AND GUIDELINES CALCULATION

The base offense level for a violation of the statute to which Tessina pled guilty—21 U.S.C. Section 841(a)(1)—is affected by the weight of the drugs involved.  *See* Sentencing Guidelines Section 2D1.1(c).  That weight is not limited to that of the drugs charged in the indictment, however, and it includes the weight of the drugs connected to Tessina's relevant conduct.  *See United States v. Madkour*, 930 F.2d 234, 237 (2d Cir. 1991); *See also*, *Booker*, 543 U.S. at 233-35.

Drug weight, like any other sentencing factor, is to be determined by a preponderance of evidence.  *See United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000).  Although—as Tessina points out—some Second Circuit case law may suggest a more robust evidentiary standard of "specific evidence" for uncharged drug weights, *United States v. Shonubi*, 103 F.3d 1085, 1089-90 (2d Cir. 1997), the Second Circuit later made clear that even in light of such language there is no reason—and, in fact, no legal authority—to depart from the preponderance standard, *see Cordoba-Murgas*, 233 F.3d at 708-09; *United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008).

Both the drugs involved in the offense of the conviction as well as drugs that are "part of the same course of conduct or common scheme or plan as the offense of the conviction" should be included in the drug-weight calculation.  Sentencing Guidelines Section 1B1.3(a)(2).  A course of conduct means "an identifiable pattern of criminal conduct" based on the "nature of [the] defendant's acts and how frequently the same sort of acts have been repeated by him."  *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993).

To determine the total drug weight, a sentencing court may draw logical inferences based on circumstantial evidence of other drugs attributable to a defendant,

so long as the evidence in the record is reliable and supports the finding by a preponderance of evidence. *United States v. Prince*, 110 F.3d 921, 925 (2d Cir. 1997); *United States v. Pirre*, 927 F.2d 694, 697 (2d Cir. 1991). For example, *Prince* involved a controlled delivery of forty-seven boxes suspected to contain drugs, but only forty-one of the boxes were recovered, leaving six boxes missing. *Prince*, 110 F.3d at 923. Even so, the sentencing court based the total drug weight on both the drugs that were recovered as well as the drugs that were presumably in the missing boxes. *Prince*, 110 F.3d at 924. The district court inferred that because the recovered boxes contained marijuana, it was highly likely that the six missing boxes also contained a similar amount of marijuana and calculated the defendant's base offense level accordingly—a finding and calculation that was upheld by the Second Circuit. *Id.* at 925.

Here, Tessina was charged with, and pled guilty to, a two-count indictment charging possession of heroin and fentanyl with the intent to distribute them. No drug weight was specified in the indictment. Docket Item 11. In fact, during the plea colloquy, Tessina agreed that any dispute about the weight of the drugs would be resolved at the time of sentencing. Docket Item 94 at 22. Therefore, any drug weight—for both the drugs that were included in the charge, indictment, and plea, as well as the drugs that encompass relevant conduct—must be proved by a preponderance of evidence and must relate to the same course of conduct or common scheme as the offenses to which he pled guilty.

To begin, the government alleges that the weight of the drugs sold in the controlled buys included 1.04 grams of a mixture of heroin and fentanyl recovered from the controlled buy on March 9, 2015 (Item 1), and 1.91 grams of a mixture of heroin and

fentanyl recovered from the controlled buy on March 10, 2015 (Item 2).  But other substances also were recovered from Tessina after the second controlled buy:  a single "suboxone patch" (Item 3); 4.83 grams of cocaine (Item 4); and 29.9 gross grams of an unidentified substance in a plastic bag (Item 5).  Docket Item 84 at 6.  And the government contends that Tessina's relevant conduct also includes an additional amount of heroin based on a course of conduct—i.e., a pattern of sales—between Haak and Tessina.  *Id.* at 5-6.

### A.    Drugs recovered from the controlled buys

On March 9 and March 10, 2015, law enforcement orchestrated controlled buys between Haak and Tessina.  As noted above, these controlled buys ultimately led to the arrest and indictment of Tessina, as well as to the drugs recovered here.

Item 1, a bag containing a powdery substance, was recovered from the first controlled buy on March 9, 2015.  Gov. Ex. 13A.  According to the lab results in evidence, Item 1 was weighed, tested, and confirmed to contain 1.04 grams of a mixture of heroin and fentanyl.  Gov. Ex. 14.

Items 2-5 were recovered from the second controlled buy on March 10, 2015.  Item 2 included two smaller bags contained in a larger bag.  Gov. Ex. 13B.  The substance in one of the two smaller bags was weighed, tested, and confirmed to contain .95 grams of a mixture of heroin and fentanyl.  Gov. Ex. 15.  The substance in the other smaller bag was not identified, but it looked the same and had virtually the same weight, .96 grams.  Together, the substances in Item 2 weigh 1.91 grams.  Although the substance in the second smaller bag was not confirmed, Gov. Ex. 15, given that the two bags were recovered together in one bag, looked identical, and contained virtually the

same weight, the circumstantial evidence leads to the inference that the second bag contained the same substance as the first. *See Prince*, 110 F.3d at 925. Therefore, the Court will include the 1.91 grams from Item 2 in its computation of the weight of the heroin and fentanyl mixture.

Item 4 also was recovered on March 10, 2015. The description of Item 4 from the officer at the scene identified only one plastic bag, Gov. Ex. 13B, but the lab report noted that there was one plastic-wrapped substance as well as another plastic bag inside a larger bag. Gov. Ex. 13.[3] The substances wrapped in Item 4 were confirmed to contain cocaine[4] and to weigh 4.83 grams. *Id.*

Tessina argues that his possession of the cocaine in Item 4 should not be included in his relevant conduct because it was intended for personal use. Docket Item 105 at 11. But there is no evidence to support that assertion. In fact, the evidence suggests that the cocaine was, more likely than not, intended for distribution, especially because it was recovered along with other drugs that Tessina intended to distribute and actually did distribute.

---

[3] Tessina argues that this discrepancy renders the evidence unreliable, but this Court disagrees. As the government correctly notes, law enforcement officers are trained not to expose themselves to substances, and the laboratory—with its inherent safety measures—is better positioned to more thoroughly examine the containers and substances recovered. Docket Item 107 at 4.

[4] Although the substance appeared rock-like, Gov. Ex. 13B, the lab reports identified the substance only as cocaine in some form, not necessarily cocaine base. For that reason, the Court is willing to accept the substance only as cocaine in some form. Moreover, although the government refers to the drug as "cocaine base" in its memo, the government agreed with the powder-cocaine conversion rate in the PSR. *See* Docket Item 107 at 6 ("The PSR appropriately calculated the relevant conduct using the conversation rate for cocaine . . . rather than that used for cocaine base.").

Tessina repeatedly objected to the laboratory reports—used to determine the weight and composition of the drugs—on the basis that they were unsupported by the testimony of any witness and had some discrepancies. Docket Item 93; Docket Item 105 at 8. But the detailed methodology of the laboratory as well as the laboratory's accreditation amply ensures the accuracy and reliability of the reports. Docket Item 107 Ex. A. As such, they are good evidence of the substances and their weight. This Court has fully considered the reports, the documentation submitted in support of them, and Tessina's argument, and this Court concludes that the government has met its burden. The information submitted to identify and weigh Items 1, 2, and 4, carries sufficient indicia of reliability and persuades this Court that the items are, more likely than not, what the laboratory said they are.

Items 3 and 5, however, are a different story. Although Item 3, the alleged suboxone patch, was examined by the lab, no controlled substance was identified. Gov. Ex. 13. Item 5 initially went entirely unexamined, Gov. Ex. 13; later, it was weighed but its drug content was not identified, Gov. Ex. 15. For that reason, this Court agrees with the PSR that only Items 1, 2, and 4 can be attributed to Tessina and used to determine the weight of the drugs at issue with respect to the controlled buys and related relevant conduct.

In total, the weight of the drugs recovered from items 1, 2, and 4 was 2.95 grams of a mixture of heroin and fentanyl and 4.83 grams of cocaine.

## B. Quantity of heroin attributable to a course of conduct

Next, the Court must consider whether the government offered sufficient evidence to hold Tessina accountable for an additional quantity of heroin based on a

"pattern of criminal conduct" between Tessina and Haak.  The government argued that—in addition to the drugs recovered from the controlled buys—Tessina should be held responsible for 24 grams of heroin.  Docket Item 107 at 4.  To arrive at that weight, the government relied on Haak's "ballpark estimate" that Tessina sold him around 1 gram of heroin at least a "couple of dozen" times.  *Id.*  Although the controlled buys corroborate Haak's statement that he purchased about 1 gram at a time from Tessina, Gov. Exs. 14; 15, there is no parallel corroboration for the number of transactions between Haak and Tessina.

As the video of Haak's interview by law enforcement demonstrates, Haak did not immediately say that he purchased heroin from Tessina a "couple of dozen" times.  In fact, he struggled to offer a specific number of times that he bought drugs from Tessina. It was only after the interviewer told Haak that a ballpark estimate would suffice that Haak generated what sounds like nothing more than an estimate.

| | |
|---|---|
| Zawierucha: | How many times have you went in and got a gram with [Schukraft]? |
| Haak: | uhh. |
| Zawierucha: | Just truthfully. Tell me, you tell me… |
| Haak: | Honestly, I don't know. |
| Zawierucha: | You could tell me a thousand times, it no… |
| Haak: | A bunch of times, I can say that. |
| Zawierucha: | Give me a ballpark number. |
| Haak: | Couple of dozen, at least. |

Gov. Ex. 1 at 19:35-19:55.

Sentencing courts have wide discretion in deciding what to consider, but a sentencing calculation that is based on nothing more than a "ballpark number" when the

informer admitted that he could not truthfully recall the number of times he purchased

drugs does not meet any standard of proof.  And computing Guidelines based on an

uncorroborated statement that admittedly was not much better than a guess might raise

due process concerns as well.[5]

Although Haak's uncorroborated ballpark estimate lacks sufficient accuracy to

support a number of transactions and therefore an extrapolated weight, there certainly

is good reason to believe that Tessina sold Haak more than the 2.95 grams in the

controlled buys.  Indeed, Haak's ability to arrange the controlled buys on relatively short

notice corroborates his interview statement that he purchased drugs from Tessina

before.  What is more, Haak also said that he had purchased a gram of heroin at a time

from Tessina, and the controlled buys corroborate this amount.

Because there was a drug-dealer-and-buyer relationship, another source of

evidence from which to infer a total number of transactions are the phone records.  An

inference from those records may not be perfect, but it is reasonable—and surely more

reliable than either Haak's uncorroborated guess or inferring that Haak had never

purchased heroin from Tessina before the controlled buys.  Indeed, because of the

greater reliability of the phone records as compared to Haak's ballpark estimate of the

---

[5] Tessina argues that none of Haak's statements should be admitted against him because this Court previously ruled that those statements were "not a free and voluntary act"—and therefore unreliable or inaccurate—under the Fifth Amendment. Docket Item 70 at 8-9; Note 1 *supra*.  But concerns of reliability and accuracy are placated by other evidence that corroborates some of Haak's statements from the interview.  *See Fatico*, 579 F.2d at 712-13.  So although this Court has reason to question the reliability of Haak's uncorroborated statements, his corroborated statements may well provide enough "indicia of reliability" for use here.

number of buys, Tessina himself proposed that the number of communications between the two might serve as a guidepost to determine drug weight. [6]  Docket Item 105 at 13.

Before looking at the phone records, however, it is useful to reiterate what is known about the relationship between Haak and Tessina:  (1) Haak said that he purchased heroin from Tessina on some number of prior occasions, which was corroborated by Haak's ability to arrange the controlled heroin buys;[7] (2) Haak said that each purchase was for approximately 1 gram, which was corroborated by the two controlled buys of about 1 gram each;[8] and (3) Haak said that he arranged these purchases by calling, not texting, Tessina, which was corroborated by the phone records.[9]  Moreover, there is no evidence suggesting a friendship between Haak and Tessina or any other reason why they might communicate other than to sell and purchase drugs.  So the number of communications between Haak and Tessina might suggest a number of drug deals and therefore a weight of heroin for purposes of relevant conduct.

---

[6] Initially, Tessina recommended that the number of calls between Tessina and Haak—73 in total—should be divided by 8 (a number seemingly pulled from thin air) to arrive at a total of 9 single gram sales of heroin.  Docket Item 105 at 16.  When pressed at oral argument, however, Tessina conceded that this calculation was "not intended as a serious proposal" but rather was meant to "highlight the arbitrariness" of the task at hand.  Docket Item 112 at 42-43.

[7] Statement made in Gov. Ex. 1 at 11:14-11:27; corroborated by Docket Item 1 at 3.

[8] Statement made in Gov. Ex. 1 at 20:30-20:40; corroborated by Gov. Ex. 14-15.

[9] Statement made in Gov. Ex. 1 at 21:08-21:17; corroborated by Gov. Ex. 21; 24.

The phone records indicate that there were 13 or 14 days when Haak communicated with Tessina.[10] Haak's phone records catalogue 14 days—many with multiple calls placed in one day.[11] Gov. Ex. 21. But Tessina's phone records show only 13 days of contact between Haak and Tessina.[12] Gov. Ex. 24. Also, some dates that appear in Haak's phone records do not appear in Tessina's records. *Compare* note 11 *supra, with* note 12 *supra.* Even so, there are at least 13 days of documented communication between Haak and Tessina. And this Court finds that it is more likely than not that on these 13 days, there were 13 drug transactions each for approximately 1 gram of a mixture of heroin and fentanyl.

The Court recognizes that the phone records show only dates of communication or attempted communication and do not include content. But other evidence fills in some of the gaps. Clearly, Haak and Tessina had a relationship predicated on purchasing heroin: Haak not only said so in the interview, but the controlled buys prove this to be true.[13] Additionally, on the days of the controlled buys—which are not

---

[10] The government concedes that the Court could not legitimately use the phone records to find that there were 24 communications leading to 24 drug transactions, and therefore to evidence the "couple of dozen, at least" sales that Haak estimated. Docket Item 98 at 128

[11] January 25, January 26, February 4, February 11, February 12, February 13, February 15, February 18, February 22, February 24, February 26, February 27, March 2, and March 3. Gov. Ex. 21; Docket Item 106 at 26.

[12] January 25, January 26, February 4, February 11, February 13, February 15, February 18, February 22, February 25, February 26, February 27, March 2, and March 3. Gov. Ex. 24.

[13] In fact, Haak said that until shortly before his interview, his contact with Tessina—to purchase drugs—went through a mutual acquaintance and go-between, Mark Schukraft. Gov. Ex. 1 at 13:35-14:05.

counted in the dates above—Haak similarly made a series of phone calls to Tessina to arrange for the purchase of heroin. *See* Gov. Ex. 21 at 62, 64. Tessina communicates only over the telephone, so there would be no text messages between the two. *See* Gov. Ex. 1 at 21:08-21:17. Finally, the weight of the drugs purchased in the controlled buys corroborates Haak's statement that he buys 1 gram at a time from Tessina. Thus, based on all this evidence, there is sufficient proof—by a preponderance of the evidence—that Tessina sold and had a course of conduct to sell 1 gram of heroin to Haak on at least thirteen occasions.

Based on all the above, the Court finds the following drug weights attributable to Tessina: (1) 2.95 grams of a mixture of heroin and fentanyl from the controlled buys, together with 13 grams of a mixture of heroin and fentanyl based on the course of conduct between Haak and Tessina, for a total of 15.95 grams of heroin,[14] and (2) 4.83 grams of cocaine recovered after the second controlled buy. When converted to the marijuana weight, *see* Sentencing Guidelines Section 2D1.1 (commentary (8)(D)), the heroin converts to 15.95 kg of marijuana and the cocaine converts to .96 kgs of marijuana. The total drug weight for which Tessina is responsible therefore converts to 16.91 kgs of marijuana. This generates a base offense level of 14 under the Guidelines. Sentencing Guidelines Section 2D1.1(c).

Having found a base offense level of 14, the Court next addresses whether a death resulted from Tessina's conduct.

---

[14] Although the substance included both heroin and fentanyl, this Court accepts the PSR's calculation of a weight based on only heroin. Docket Item 84 at 6. The government did not contest this conversion rate, and Tessina maintains that he had no knowledge of the fentanyl in the drugs even though they tested positive for that substance.

### III. SECTION 5K2.1

In several motions, Tessina argues that because the government could have, but did not, charge the statutory "death results" language in the indictment, it should not now be permitted to cite the death of James Forness as a factor that might increase Tessina's sentence above the statutory maximum of the crime to which he pled guilty. *See, e.g.*, Docket Item 71 at 10. Tessina cites a string of cases that distinguish an element of the offense—which must be proven beyond a reasonable doubt and might increase the statutory maximum sentence or require a mandatory minimum, from a sentencing factor—which must be proven by a preponderance of the evidence and therefore cannot affect the statutory maximum or compel a mandatory minimum.

Tessina is correct.[15] There is no mandatory minimum here, nor can there be an increased statutory maximum sentence because death resulted. The government chose not to charge Tessina with causing a death and therefore was not required to prove beyond a reasonable doubt that a death resulted. *See Burrage*, 134 S. Ct. at 887

---

[15] The government's post-sentencing briefing argued for a total offense level of 35 and a sentence of life, even though Tessina's statutory maximum sentence is twenty years under the statute with which he was charged. Docket Item 104 at 24. Though the government later corrected itself, noting that the life imprisonment recommendation was made in error, Docket Item 107 at 1, such an error at such a critical stage of the criminal proceeding concerns this Court. The government maintains that it seeks an upward departure that would increase Tessina's Guideline range from 33-41 months imprisonment to 292-365 months imprisonment. *Id.* But such a sentence still would be above the statutory maximum for the crime to which Tessina pled guilty, therefore requiring proof beyond a reasonable doubt that Forness's death resulted from drugs sold by Tessina. *See Burrage*, 134 S. Ct. at 887. The death policy statement is not an end run around charging that a death resulted. Nevertheless, because the government seeks some upward departure under Section 5K2.1, this Court will address the government's position while recognizing the obvious constitutional prohibition against a sentence above the applicable statutory maximum. In the future, the government should be careful to only advocate for sentences within the boundaries of the charge it chose to pursue.

("Because the 'death results' enhancement increased the minimum and maximum sentences to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt."). For that reason, the statutory "death results" enhancement does not apply.

But while the increased statutory maximum sentence and the statutory mandatory minimum do not apply here, the Sentencing Guidelines upward departure for causing a death still may apply. Under the Guidelines, a court may depart upward under the Guidelines Section 5K2.1 if it finds by a preponderance of the evidence that death resulted from a convicted defendant's relevant conduct.[16]

## A. Preponderance of evidence standard

Section 5K2.1 affords a court discretion to "increase the sentence above the authorized guideline range" if it finds that death resulted from the criminal conduct. Sentencing Guidelines Section 5K2.1. But under that section, "a loss of life does not automatically suggest a sentence at or near the statutory maximum." *Id.* Rather, the court should consider factors that are usually used to distinguish culpability in a homicide, including "the defendant's state of mind." *Id.* If an increase in the sentence is warranted, the increase should depend, in part, on whether the death "was intended or knowingly risked." *Id.*

---

[16] Although the government has requested application of both Section 5K2.1 (death results) and 5K2.2 (serious injury results), this Court conducts its analysis under 5K2.1 because "in general, the same considerations apply." Sentencing Guidelines Section 5K2.2. Moreover, based on the facts in this case, there would be no factual basis to conclude that Tessina's conduct resulted in serious injury to someone but not in a death.

To assess the applicability of 5K2.1, "the court should use the preponderance of the evidence standard to determine whether death resulted." *Cordoba-Murgas*, 233 F.3d at 710;[17] *see also* Sentencing Guidelines Section 6A1.3 (commentary) ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the Guidelines to the facts of a case."). Even so, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures." *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996).

Other courts that have considered upward departures under Section 5K2.1 have used the preponderance of the evidence standard as a guide to determine whether, and to what extent, a defendant's sentence should increase because a death resulted. *See United States v. Salyers*, 661 Fed. Appx. 862, 866 (6th Cir. 2016) (concluding that there was "ample support in the record to find by a preponderance of the evidence that Dickerson's death resulted from Salyers's conduct" when Salyers admitted giving Dickerson heroin prior to his death). One court found an upward departure warranted when the defendant sold heroin to an individual and then asked that individual to sell the drugs to another individual, who subsequently died from an overdose. *United States v. Ihegworo*, 959 F.2d 26, 27 (5th Cir. 1992). Another found that an upward departure was

---

[17] In fact, in *Cordoba-Murgas* the Second Circuit reversed the district court's decision to require the government to prove by a higher standard–in that case, "clear and convincing evidence"–that death resulted from a defendant's conduct before the court could depart under Section 5K2.1. C*ordoba-Murgas*, 233 F.3d at 708-09.

warranted when the government proved that the defendant-dealer had a chain of text messages coordinating a drug deal with the victim and that the victim used no other source of heroin on the day of his death. *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. March 10, 2015).

So the question before this Court is whether the government has proved by a preponderance of the evidence that James Forness's death resulted from relevant conduct connected to Tessina's offense.

### B. Whether Forness's death resulted from Tessina's conduct

The facts and evidence show that: (1) Tessina is a drug dealer who sold approximately 13 grams of heroin to Haak around the time of Forness's death and before the two controlled buys; (2) Haak told investigators that he sold drugs to Forness on the day that Forness died from a drug overdose; (3) both Haak and Forness knew that the drugs Haak sold and Forness used contained fentanyl; and (4) Forness died from a fentanyl overdose. The government suggests an additional finding: that Forness's death resulted from drugs that Tessina sold to Haak. But working backward from Forness's death highlights the holes in the government's suggestion.

Forness was pronounced dead on February 28, 2015, after he was found unconscious on his bedroom floor. Gov. Ex. 2. Both the police and Forness's stepfather, who was home with Forness when he died, suspected that Forness died of a heroin overdose. Gov. Ex. 2; Gov. Ex. 4 at 2. But Forness did not have ***any*** heroin in his system when he died. Rather, fentanyl was the sole cause of his death. The medical examiner who performed Forness's autopsy confirmed this at the evidentiary hearing:

"Q:     So, essentially, what – what you get then, at least in most cases after somebody died, is sort of like a snapshot of what was in their system at the moment of death, right?

A:     Yes, that's the hope.

Q:     Okay. And in this case, based on the snapshot and the entire investigation, Mr. Forness ingested and what killed Mr. Forness was pure fentanyl, right?

A:     Yes.

Q:     This was not a mixture of heroin and fentanyl?

A:     No, there was definitely no heroin."

Docket Item 98 at 107, 108.

Earlier in the day on February 28, 2015, Haak had sold drugs to Forness, as Haak himself admitted and as corroborated by cellphone records and text messages. Gov. Ex. 1; Gov. Ex. 3N-3U.  And the evidence suggests that Forness used the drugs that Haak sold him and that Haak and Forness both knew that those drugs contained some fentanyl.  Forness texted Haak to say "[t]hat was good today so far just did half. Way better than last time."  Gov. Exs. 3V, 3W.  In response, Haak says, "Yeah be careful."  Gov. Ex. 3X.  Forness replies, "[y]up did 2 and wow must got fentenal [sic] in it."  Gov. Ex. 3Y.

But there is no evidence that Tessina ever sold pure fentanyl to Haak.  First, he pled guilty to possessing a mixture of heroin and fentanyl with the intent to distribute it. Docket Item 11.  Moreover, the controlled buys on March 9 and March 10, 2015, a week after Forness's death, corroborate that Tessina's product contained both heroin and fentanyl.  Gov. Exs. 14; 15.  And when law enforcement asked Haak what he knew about Tessina, Haak said, "he moves around a lot and he deals *heroin*.  That's about all I know about him."  Gov. Ex. 1 at 12:50-13:00 (emphasis added).

The government's strongest evidence linking Tessina to Forness's death are Haak's statements, described below. At best, however, these statements—which lack sufficient corroboration to be reliable[18]—create little more than the possibility that the drugs Haak sold to Forness came from Tessina.

Haak told law enforcement that he bought drugs from Tessina the day before Forness died and that he sold those drugs to Forness. Gov. Ex. 1 at 15:39-16:04. But Haak later said that he bought the drugs indirectly from Tessina; it was his friend, Mark Schukraft, who was the direct purchaser.[19] *Id.* And it was Schukraft—not Tessina—who told Haak to be careful with the drugs because they were strong. *Id.* at 16:43-17:00.

So the government's evidence leads to the reasonable inference that both Schukraft and Haak knew that the drugs contained fentanyl, presumably mixed with heroin. But this does not also lead to the inference—without more proof—that Schukraft or Haak knew that the drugs were pure fentanyl or that they ever purchased pure fentanyl from Tessina. Because the controlled buys confirmed that Tessina was selling a mixture of heroin and fentanyl—exactly what Haak thought he was buying from

---

[18] These statements are distinguished from Haak's statements that relate to the prior drug deals and the quantity of drugs purchased, which were corroborated by lab reports and other evidence. Notes 7-9 *supra*.

[19] The government asserts that there is no "legal significance" to this fact, because it "does nothing to mitigate or extinguish Tessina's criminal responsibility for ultimately sourcing the lethal dose." Docket Item 104 at 13-14. But the Court fails to see how—in an inherently factual inquiry that is intended to determine whether it is more likely than not that Tessina is responsible for Forness's death—an attenuated chain of custody is insignificant.

Tessina—the Court cannot conclude by a preponderance of the evidence that the pure fentanyl that killed Forness came from Tessina.

What is more, Haak told law enforcement that he "***usually*** gets [heroin] from Fran [i.e., Tessina]," Gov. Ex. 1 at 19:57 (emphasis added), but he was not asked about any other dealers from whom he purchased heroin, with or without fentanyl. And the fact that he "usually" gets it from Fran suggests that there are indeed others from whom he obtained drugs as well.

In addition, Haak told the investigators that his relationship with Tessina was relatively new and that Schukraft usually purchased directly from Tessina. On the occasions when the two bought drugs from Tessina, Tessina sold the drugs in a plastic baggie, and Schukraft would repackage them in his own signature cigarette wrapper. Gov. Ex. 1 at 19:05-19:15. But at the evidentiary hearing, the officer who responded to the 911 call at Forness's house testified that he found no evidence of either a plastic bag or any other packaging material such as the cigarette wrapping. Docket Item 98 at 41. So the absence of packaging is another gap in the government's attempt to link Tessina to the drugs that killed Forness.

Finally, it bears repeating that Forness did not have any heroin in his system when he died. There is no evidence that Tessina ever sold pure fentanyl—and good evidence that he sold a heroin and fentanyl mixture. The government tries to explain away the discrepancy between Forness's autopsy and the contents of the drugs recovered from the controlled buys by asserting that heroin dealers "often don't know what exactly is in the product they are selling." Docket Item 104 at 18. But that assertion—even if true—cannot substitute for proof. And if culpability under the death

policy statement is to be assessed with consideration to the "defendant's state of mind" among other factors, Sentencing Guidelines Section 5K2.1, the government undercuts its own theory by acknowledging that Tessina likely was unaware of the potency of his product.

For the government's theory to be true—that Tessina's drugs caused the death of James Forness—it would need to be more likely than not that on February 27, 2015, Tessina sold pure fentanyl to Haak, who thought he was buying heroin perhaps mixed with fentanyl; that the drugs Forness ingested on February 28, the day of his death, were the same drugs that Tessina sold to Haak and Schukraft; and that a week after Forness' death—on the days of the controlled buys—Tessina was pushing an entirely different product than Forness consumed, one that was consistent with what Haak thought he was buying in the first place.

Although a close call, the Court cannot conclude that the balance tips in favor of finding that Forness's death resulted from Tessina's conduct, and thus declines to apply Section 5K2.1 and the upward departure that might follow. None of the evidence submitted is akin to the evidence in other cases departing upward under Section 5K2.1, such as direct communication between the dealer-defendant and the victim, *Russow*, 2015 WL 1057513 at *3, or the dealer-defendant's express request to sell drugs to the victim, *Ihegworo*, 959 F.2d at 27.

## IV. SECTION 3553(a) FACTORS

Even though the Court has concluded that the death policy statement does not apply, some of the information submitted may well influence the Court in deciding on a sentence for Tessina that is "sufficient, but not greater than necessary" under 18 U.S.C.

25

Section 3553(a). In the interest of candor and notice, and so that both sides have an opportunity to weigh in, the Court advises that it is considering an upward departure or variance based on "the nature and circumstances of the offense and the history and characteristics of the defendant; and . . . the need for the sentence imposed to reflect the seriousness of the offense . . . to afford adequate deterrence to criminal conduct, [and] to protect the public from further crimes of the defendant." 18 U.S.C. Section 3553(a).

## CONCLUSION

For the reasons stated above, this Court finds that (1) Tessina is responsible for 15.95 grams of a mixture of heroin and fentanyl and 4.83 grams of cocaine, which converts under the Guidelines to a total drug weight of 16.91 kgs of marijuana; and (2) an upward departure is not warranted based on the death policy statement or the physical injury statement because there is insufficient proof that James Forness's death resulted from Tessina's conduct.

The date for sentencing will be January 23, 2018, at 12:30 pm.


SO ORDERED.

Dated:     December 12, 2017
           Buffalo, New York



                              _s/Lawrence J. Vilardo_____
                              LAWRENCE J. VILARDO
                              UNITED STATES DISTRICT JUDGE